Tt.ht.hv, J.,
dissenting. I cannot concur with the majority of the Court in their opinion just announced; and, as no question of graver import has ever been presented for solution to any tribunal, I deem it proper to state the reasons which have brought me to a conclusion, differing totoccelo from the one reached by three of the other judges.
The plaintiff’s action against the defendant was to recover the price of slaves, sold with full legal warranty on the 8th day of December, 1860, *242 and it is resisted by the defendant, whose answer and grounds of defence amount to this :
1. That by the act of the sovereign authority, which is oqualfy binding on the plaintiff and defendant, and for which the said plaintiff is equally responsible with the defendant, the consideration for which the note sued on was given has been destroyed; and that the plaintiff is estopped' and restrained from obtaining, and the Court from granting, a judicial remedy to enforce the performance of a contract based upon African slavery.
2. That the said contract, having been entered into on the part of both plaintiff and defendant, with reference to and under guarantees and protection contained in the laws and constitution of the Federal and State Governments upon the subject of African slavery, and those guarantees and protection which entered into the consideration for which the note sued on was given, having been revoked, annulled and abolished by the sovereign authority of the Federal and State Governments, the plaintiff is estopped and restrained from obtaining and the Court from granting, a judicial remedy to enforce the performance of the said contract.
3. That by the acts of the sovereign authority as aforesaid, the judicial remedy can be no longer invoked to enforce the rights acquired by this vendor under the contract sued upon, and that the said plaintiff is estopped and restrained by equity and good conscience from obtaining and the Court from granting, a judicial remedy to enforce the performance of the said contract in favor of the other contracting party only.
4. That by the acts of the sovereign authority as aforesaid, African slavery has ceased to be the subject of conventional obligations and of judicial actions, and it is contrary to equity, to good conscience, to good morals, and public policy, to enforce the performance of obligations, which have no longer the sanction of the laws of the land, and under which the reciprocal rights and responsibilities of parties created by such .contracts, can no longer be enforced by judicial authority.
This defence, which takes a wide range, is opposed by the plaintiff, whose theory amounts to this :
1. That his legal right and remedy under the law of his contract, which he stands upon, are in no wise affected by the change in the status or condition of the slave sold by him.
2. That the clauses in the Federal and State constitutions, inhibiting slavery, had no retroactive bearing or effect whatever upon contracts previously entered into in relation to that species of property, blit merely eo instanti dissolved the relations between masters and slaves, and terminated the rights of the former.
3. That the emancipation of a slave by the sovereign power is equivalent in law to his perishing by death, as in either event the property, res, ceases to exist, and the maxim of the Roman law, res peril domino, is as applicable to the one case as to the other.
The loss falls upon.the owner who has no recourse in warranty against his vendor.
The questions which arise in this case involve vast interests, and it is therefore not surprising that great talent has been enlisted, and much ingenuity displayed by both parties to sustain their antagonistic theorems.
*243 The defandants’ position, in my opinion, embrace the whole subject of inquiry.
1. Did the vendor acquire by the sale of his slaves as soon as it was consummated, any vested legal rights ?
2. Have those rights been legally divested or destroyed, so as to deprive him of his legal remedy to enforce them ?
It is the province of the Courts to solve these queries. The defendants urge that the vendor covenanted with the vendee, under the title which he conveyed to him, to maintain the latter in the peaceable possession of the slaves in perpetuity—a possession without limitation, at least so far as the contract, the lex contractus or the lex temporis was concerned. The only condition to this warranty of perpetual and peaceable possession being, that the right of the person evicting should have existed before the sale.
The question, as I understand it, is purely one of warranty—for it is not controverted that when the sale of the slaves was made it embraced every element of a legal contract. I shall, therefore, proceed to ascertain whether by the contract of sale or the law which entered into and controlled it—the emancipation of the slaves sold, by the general abolition of slavery, long after the sale, amounted to a loss or eviction which was covered by the general warranty.
Warranty, under our law in contracts of sale, exists in all cases where the loss of, or eviction from, the thing sold is imputable to the vendor or to the imperfection of his title, and not where the loss or eviction proceeds from some unforeseen, fortuitous event beyond the control of the vendor.
Article 3522, $ 7, of the Oivil Code, defines a fortuitous event to be that which happens by a force which we cannot resist. In casos of redhibition the rule is, “if the thing sold has perished by a fortuitous event before the purchaser has instituted his redhibitory action, the loss must be borne by him. Civil Code, Article 2511. Was the act of the sovereign inhibiting slavery, a fortuitous event or vis major; and, if so, does the fact that the property sold was aa. “ African” slow, make the case an exceptional one, so as to exclude it from the rule of warranty applicable to the sales of property generally ?
The first of these queries, in my opinion, should be answered affirmatively, the last negatively. It is entirely unnecessary and supererogatory, as I conceive, to enter in the present instance into any elaborate dissertation upon the subject of African slavery, to trace its origin and progress in the United States—for as was said by Mr. Justice McLean, who gave a dissenting opinion in the Bred Scott case, and who should therefore be deemed good authority: “It is immaterial whether a system of slavery was introduced by express law, or otherwise, if it have the authority of law. ” And by our law, slaves eo nomine, were classed as things with every other species of corporeal objects. Civil Code, Articles 439, 450, 452, 461, 3422, 3256, l 3.
Slaves were property in the strictest sense of the term. They were deemed so to be by the constitution of the United States, up to the time when, by an amendment to that instrument, slavery was abolished. See the case of Scott v. Sanford, 19 Howard, page 411; and also by the law of *244 nations. (See Wheaton's Law of Nations, 724.) They were introduced into Louisiana as property by the treaty of cession of 1803, and the laws of the United States and of the State of Louisiana, recognized slaves as property until the time of the rebellion.
Whether the traffic in slaves was in conflict with natural law, or violated any canon of ethics, is an abstract question which it is unnecessary to discuss. For all the purposes of the present inquiry, it suffices that in every age of the world, from the earliest times, slaves, both male and female, have been bought with money, (Lev. xxv, 1 and 44, 45 and 46; Gen. xvii, 9. 10, 11, 12 and 13,)'and have been treated as an ordinary article of merchandise.
In Louisiana, and the other Southern States, ‘ ‘no one” (to use the language of Mr. Chief Justice Taney) “questioned the opinion that slavery and the traffic in slaves was morally right. It was regarded as an axiom in morals as well as in jaolitics, which no one thought of disputing, or supposed to be open to dispute, and men in every grade of society, daily and habitually acted upon it in their private pursuits, as well as in matters of public concern, without doubting for a moment the correctness of this opinion.”
What, in the course of time, would have been the ultimate condition of slaves in Louisiana, is a mere matter of conjecture; but one thing is certain, that but for the rebellion, the day was distant when the change would have been wrought; and, indeed, the change in the status of slaves was, even with that cause, more attributable to policy and expediency than to any consideration of philanthrophy or humanity.
The principle that general warranty in contracts of sale, does not contemplate nor extend to losses of, or the evictions from, the thing sold by force mqjeure, which the act of the sovereign, “ Fait du souverain,” is deemed to be, seems to be fully recognized by eminent jurists, and by the tribunals of France, whose laws, like our own, are based upon the Roman civil law. It finds place in the maxim: Futuros eviciionis casus post contraclam vendiiionem ad vendiloremnon periinere. The doctrine receives unqualified supjiort in the following authorities: Oass. 27, plur. un 11, et 20 Mars, 1850; T. 2, 51, dans les motifs. Bordeaux, 23 Janv., 1826; Troplong, vente T, 4, No. 423; Duvergier, T. 1, No. 35; Marcadé, sur Particle 1826, No. 2, page 253, 5th edition; Zacharia, et ses annotateurs; Massé et Dugué, T. 4, 685, page 295; Texte et note 8; Aubré et Rey d’aprés Zacharia, T. 3, 355, et la note Rep. Gen. Pal. Fait du Prince, No. 5, 11 suivantes; Meme Rep. et Sup. Yerbe Yente 937, 1113; Tarard, faits du souverain; Pother, No. 935; Domat liv. 1, § 10.
This Court has recognized the same principle in two cases, in one of which, Ollie v. Ogilvie, 13 La. 475, the Court deemed a loss, or eviction from such a cause, a damnum absque injuria; and in the other case, Bourg v. Niles, 6 An. 77, the Court observed, “it is an eviction by the act of the sovereign, and the sovereign alone is to make indemnity where indemnity is due,” i. e., to the owner.
The authority referred to by the Court, for its opinion on that point, is the doctrine laid down in Merlin, Faits du Souverain, Répertoire, which, after giving a clear exposition of what constitutes the Fait du Prince, ou du Souverain, says : “ Le fait du Prince est considéré a Regard des par-» *245 ticuliers, comme un cas fortuit et une force majeure que personne n’en est garant cle droit; la garantie n’en est due que quand elle est expressément stipulée,” even if such stipulation, being contrary to public order, would be binding upon the vendor. Journal du Palais, vol. 5, page 147.
A case, however, is referred to by one of the counsel, whose argument in behalf of the defendant’s position is very able and ingenious—which he confidently asserts, holds a doctrine very different from that enounced by the authorities I have quoted; but upon a careful examination of that case, I am satisfied that, so far from militating against the doctrine now advanced, it tends to sustain it. It is the case of Furstenstein, C. Bouchepoin, Dalloz, 1830, page 207, Sirey, 1830,[page 285.
The facts presented therein to the Cour Royale d’Orleans, whose judgment to which I shall allude, was affirmed by the Court of Cass, were these:
Jeróme, King of Westphalia, had, in his sovereign capacity, granted gratuitously to Count Furstenstein the estate of Immochenhain. On the 11th August, 1809, the grantee sold this property, with full legal warranty “ á iouie garantie de droit et de fait,” to Baron Bouchepoin.
In 1813, Jerome having been expelled from his kingdom, the elector of Hesse Cassel, in whose domain the land granted lay, annulled all the gratuitous grants made by Jerome.
To avoid the effect of this ordinance, the Baron Bouchepoin first applied to the Germanic Diet for relief, but in vain, and he was therefore compelled to abandon the premises.
In this state of things, he instituted in the French tribunals an action of warranty against his vendor, the Count Furstenstein, and his action was maintained throughout.
It was contended by the Count, that warranty in sales applies only to evictions imputable to the vendor or to the vices of his title, and not to extraordinary events, which could not have been foreseen, and which the vendor could not control. That the act of the prince, considered as a cause of eviction, should be assimilated to the destruction of a thing by force majeure, and could be no more a ground of warranty than would be the destruction of a thing sold, by fire.
The decision in that case was, that there was a preexisting cause for the eviction—which was, that the grant made by Jerome was in palpable violation of the laws of Hesse.
The warranty was maintained, because the dispositions of the ordinance of the elector of 11th January, 1814, were but the declaration of a preexisting right; that, therefore, the eviction—the result of that ordinance, took its source in a preexisting legislation, and had a cause anterior to the contract of sale; that it could not be considered an act of unqualified sovereignty [de pleine puissance) which originated in the will or caprice of the prince, and that, therefore, it could not be deemed an act of force majeure, or overpowering force.
How does that case compare with the one at bar ?
In the Bouchepoin case, there was an inherent vice in Furstenstein’s title which he warranted, and which had to yield to a better legal title. Why better ? Because Jerome’s gratuitous grant was, when it was madej in violation of the laws of Hesse, and those laws could not be disregarded *246 by any sovereign; and as the Court, in the language of the opinion, said:
‘ ‘ La dépossession qui esl le rcsultal de cede ordonnance, prend sa source dans une legislation pré-éxistante, qu’elle a une cause anlérieure au contrat de vente, qu’elle ne peul elre considérée comme un acte de pleine puissance quirCa sa source que dans la volonté ou le caprice d'un prince el qu’ainsi elle ne peid elre considérée comme un fail de force majeure.
' The title to the slaves transferred by the plaintiff to the defendant was an incontrovertible one, sanctioned by the laws of the United States and of the State of Louisiana.
There was not, as in the case of Bouchepoin, any preexisting right in the sovereign to annul the title for any anterior vice in it. Whatever right the sovereign had in advance, to annihilate all title to slaves, proceeded from its will or caprice, and this is the ^reat feature and distinguishing characteristic of all the authorities to which I have referred, and which harmonize with the Bouchepoin case, wherein I repeat the warranty was sustained, because Furstenstein’s title was inherently vicious, the germ of the vice being that Jerome’s grant to him violated preexisting legislation, and that the act of the elector of Hesse, in annulling it, was not one of sovereign will or caprice.
In a late decision of the Court of Cassation, that august tribunal said :
‘ ‘ Bien que des terrains vendus par une vijlle et destinés k former un quartier, n’avaient été achetés que sur la foi de l’établissement de voies publiques devant les traverser d’apres les plaps annexés, la ville ne saurait étre déclarée responsable envers les acquéreqrs de la non exécution ou de la suppression de ces voies publiques, par suite de l’expropriation pour cause d’utilité publique du sol sur lequel elles étaient et devaient étre établies, cette expropriation constitue un fait de force majeure exclusif de toute garantie.”
The destruction of feudal rights in the Regime Féodal, gave rise to much litigation in France; and analogy is supposed to be found in the decisions of the French tribunals, which sustain the doctrine advanced for the defence in this case, but the resemblance between those cases and this one is very faint, because the abolition of the Droits Féodaux et Censeuls, was accompanied with so many specifications and exceptions in the law itself—that each case, being sui generis, no decision in any one case would be authority in another.
One general principle, however, governed the whole jurisprudence on that subject, and it is broadly stated in Cass. 14 Fructidor an 10 Bull., civ. IV,. 507, liv. 1, 37: Que la vente de droits féodaux supprimés postérieurement, est aux risques de Vacquéreur, bien que la chose n’ait pas été livréo ni le prix payé.
In questions growing out of the abolition of slavery, our attention is naturally directed to the action of the tribunals of our sister States, to ascertain what solution they give to such questions, particularly the momentous one which, for several weeks past, has engaged the earnest consideration of this Court, and in which a decision has just been rendered.
' At the July term of 1866, the Supreme Court of Missouri rendered a decision, which states the principle so broadly, that the covenant did not warrant against the action of the State in abolishing the status of slavery, *247 and that there was no failure in the consideration of the note representing the price, that I deem it advisible to make a copious extract from tho opinion of the Court. The Court, after preliminary remarks, said: “ The counsel for the appellant assumes that the agreement or undertaking to warrant the title of the girl Clara forever, and that she was a slave for life, amounted to a full covenant, and that she should always continue a slave, and that any act, from whatever source, destroying property in her, constituted such a breach as would make the respondent liable, even on his warranty.
“ All warranties, however expressed; are open to such construction from surrounding circumstances, and the general character of the transaction, and the established usages in similar cases, as will make the engagement of warranty conform to the intention and understanding of the parties. 1 Pars. Contr., 576, 5 ed.
“Words of warranty should neither be extended nor contracted in their significance, but should be construed according to their fair and rational meaning. The true rule governing in the construction of covenants of warranty, is undoubtedly to look into, and ascertain the meaning and intention of the parties, if possible, by an examination of the extent of the whole instrument.
“A party may, however bind himself by covenant, where the law would absolve him from liability on the contract, were it not for his express undertaking.
“ The question to be decided here, must depend upon the meaning of the parties, after considering the surrounding circumstances. The vendor sold the slave, and covenanted with the vendee that she was a slave for life, and that he would warrant and defend the title to her forever. It is not denied that she was a slave for life, at the time the sale was made, and the covenant entered into.
“ The state of slavery was her status at that time, made so by the laws of the land, and there is no pretence that there was anything existing which tended to render the title defective, or to entitle her to freedom. The usual clause inserted in a bill of sale, in the conveyance of that peculiar species of property, was, the person sold was a slave for life; that is, that the person was made a slave by the existing law of the land, and the contract must be presumed to have been entered into with reference to that fact.
“It is the very nature of the institution of slavery, that it can only exist in a civilized nation by the force of positive law. When the vendor sold his slave, with a covenant that she was a slave for life, he intended nothing more than that the law at that time made her a slave for life.
“ The covenant extended to all defects in the title, and was intended to protect the purchaser against them. But it cannot be presumed that the sovereign act or authority of the government, by which all title or property in slaves was totally annihilated, was in the contemplation of the parties.
“ The emancipation of the slaves by the sovereign act of the people, was neither anticipated nor thought of, when the slave was sold in this case.
“ It was not in the minds of the parties, nor embraced within the pur *248 view of the warranty. In case of a sale and conveyance of real estate, when the vendor warrants the title and covenants for peaceable and quiet enjoyment, should the property be swallowed up or destroyed by an earthquake, it will not be contended that such destruction would work a breach of the covenant, rendering the seller responsible. We are unable to distinguish the case supposed, from the one presented here at bar.
‘ ‘ The ordinance of emancipation caused a complete annihalation or destruction of all property in slaves. It could not be controlled by the parties, nor was it contemplated by them; and, clearly, the covenant to warrant and defend the title to the negro, and that she was a slave for life, cannot, by any just construction, be made to apply to such an ocouiv rence.” Philips v. Evans, et als, Mo. Rep. 38, p. 315. (See also Lafrance v. Martin, 17 An. p. 77.)
This reasoning of the Missouri Court is so clear as to bring conviction to the mind, and here I may ask, if warranty is due in such cases as is now, and in the Phillips’ case presented, where would be the stopping piace for the exercise of this kind of action.
The starting point for prescription would be the date of the eviction, and vendors and warrantors of slaves, however far removed from the last title, would, in contracts for slaves, executed as well as executory, through a chain of subrogations, be at last overwhelmed in a vortex of vexatious and ruinous litigation.
I consider the abolition of slavery by the sovereign people, as the mere enunciation of one great fact, that the status of. slavery was. extinct, and that slaves became, on the instant libertini or freedmen.
It had no retroactive bearing whatever on contracts which had been entered into, in relation to that speoies of property. It was an act of sovereignty, which affected only the owner of slaves, and was in contemplation of law to them, damnum absque injuria.
It had no more effect upon contracts for slaves than would have a legislative enactment passed after their date, making some act committed by slaves not malum in se, an offence punishable with death or perpetual imprisonment; and it would not be seriously contended that a loss of a slave from such a cause, would be deemed a breach of warranty. If, in such a case, any indemnity was due by the State, the owner would be entitled to it, and it would be paid to him, as was the indemnity by Great Britain and France to the owners of slaves emancipated in their West India colonies.
The rule laid down in Article 1892 of the Civil Code, is, I think, conclusive against the purchaser; it provides: “That where the consideration of, or the cause of the contract really exists at the time of making it, but afterwards fails, it will not affect the contract, if all that was intended by the parties was carried into effect at the time. The destruction of the property after the sale is perfected,, * * * * is a case governed by this rule.”
The maxim of the Roman law, res peril 'domino, so pertinently applied in the Missouri case', is noj; always to be taken in its strictly literal sense, that there must be a perishing of the physical thing or entity. The irrevocable change in the status of the object sold, which destroys and annihilates it as property, comes upon every consideration of reason and *249 common sense, clearly within the maxim. The abolition of slavery was not a mere temporary withdrawal of that species of property from commerce, which, at a future period, could, by legislative will, be again ranked as properly.
A slave, by the abolition of slavery, has perished as properly as completely, and to all intents and purposes, as if he had been overcome by death.
See Troplong de la Yente, vol. 1, No. 359, p. 476, sur l’article 1624, C, N. et No. 359, p. 477, L. 23 Dig., de seg. juris.
I am satisfied that the right of the plaintiff to recover the price of the slaves sold by him to the defandanfs, is founded in law, notwithstanding the ingenious and plausible theories submitted to us to sustain the pretensions of the defendants. They soar too high for the judicial mind to • contemplate.
The solemn expression of legislative will, cannot be made to yield to every change of circumstances or events, and it is the sacred duty of judicial tribunals to carry out and apply recognized principles of law, upon all occasions and to all cases.
By our system, equity only speaks when the law is silent, (Article 21, Civil Code,) and in the present case the rules of law are, in my opinion, too plain to be misapprehended or misapplied.
I am, therefore, of opinion that the judgment of the District Court should be affirmed.
Justice Labauve concurred.